UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PAULINE G. GREENE | : | CIVIL ACTION NO. |
| *Plaintiff,* | : | 3:03CV00526(WWE) |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT HEALTH CENTER, CONNECTICUT DEPARTMENT OF CORRECTION | : | NOVEMBER 12, 2004 |
| *Defendants* | | |

## DEFENDANT'S RULE 56(a) 1 STATEMENT OF UNDISPUTED FACTS

1. The plaintiff Pauline Greene was hired by the Department of Correction as a Correctional Nurse in 1989. (Amended Complaint ¶ 7.)

2. On June 7, 1990, within one week of passing her working test period, plaintiff filed a worker's compensation report claiming that she was injured while running with a stretcher when a correctional officer took the stretcher from her and her right foot became wedged. (Exh. 1)

3. As a result of this injury, plaintiff was out of work for 4.5 years because "the Department would not allow me to return to work until I was deemed 100 percent …." (Exh. 2 pp. 29-31, plaintiff's deposition, Green v. Rose CV 02-0819044) [1]

---

[1] For the convenience of the court, the defendant has attached relevant pages of transcript. Please note that this deposition relates to a collateral malpractice matter that plaintiff brought against her attorney John Rose, Jr. The relevant portions of plaintiff's deposition in the instant case are also attached as Exh. 9 and are used throughout this Rule 56 statement.

    4.    Plaintiff indicated that, during her 4.5 year absence, she received worker's compensation for half the time and Social Security disability for the other half.  (Exh. 2, p. 30)

    5.    After her absence, plaintiff returned to work without restriction on May 22, 1995.  (Exh. 3)

    6.    In August 1995, plaintiff, while represented by counsel, signed a stipulated agreement wherein she agreed to receive $40,000 from the State of Connecticut in exchange for a moratorium on plaintiff bringing workers' compensation claims affecting the back, coccyx, Achilles and knees for a five (5) year period.  (Exh. 2, pp. 84-85; Exh. 4)

    7.    In November 1997, the University of Connecticut Health Center took over management of the Department of Correction's medical program (Correctional Managed Health Care – CMHC) and plaintiff became an employee of CMHC.  (Complaint ¶ 8; Exh. 5)

    8.    On or about May 1998, plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities against both UCHC and DOC, alleging, inter alia, that she had been subjected to racial slurs.  (Complaint ¶ 9) [2]

    9.    Plaintiff's CHRO Complaint and subsequently filed Federal action were dismissed by the Court.  (Exh. 6)

---

[2] As a result of plaintiff's CHRO complaint, Attorney John Rose, Jr. filed a federal lawsuit 3:99CV1783(AWT) on her behalf.  On January 25, 2001, this action was dismissed by the court pursuant to Fed. Rule Civ. P. 16(d).  John R. Williams, on January 25, 2001 entered his appearance for plaintiff and filed a Motion to Vacate the Court's dismissal.  On June 21, 2001, Judge Thompson denied plaintiff's Motion to Vacate and on July 2, 2001, granted, in an endorsement ruling, Defendant's Motion in Opposition to Plaintiff's Motion to Vacate Dismissal. (Exh. 6)  This dismissal led to the malpractice action entitled Pauline Greene v. John Rose, Jr., CV02-0819044 (Connecticut Superior Court) (See Exh. 2)

10. On July 17, 1998, Plaintiff filed a report of injury with the workers' compensation commission and indicated that she "tumbled out of chair forward" and injured her neck, knee and shoulder. (Exh. 7)

11. On July 17, 1998, Plaintiff was examined and released to work full duty. (Exh. 8)

12. On July 19, 1998, Plaintiff left her work pursuant to her July 17, 1998 injury. That was the last day that plaintiff worked. (Exh. 2, p. 59, lines 23-24)

13. Plaintiff received workers' compensation payments from July 20, 1998 through May, 2002. (Exh. 2, p. 60, Exh. 9, pp. 60-62)

14. At all times between 1998 and May 2002, plaintiff has represented to the Workers' Compensation Commission that "she was entitled to receive workers' compensation benefits." (Exh. 9, pp. 60-62)

15. At all times between July 20, 1998 and December 18, 1998, the Johnson Occupational Medical Center indicated plaintiff's "work status" as either "off work" or "modified work" with noted "restrictions." (Exh. 10)

16. On July 27, 1998, a medical report from Vincent Alvaro, PA, indicates as to Ms. Greene, "She reports feeling no better . . . . The patient has not been to work since this, stating that there is no light duty . . . She is also asking when she can go back to work . . . I told the patient I'd be happy to send her back on modified duty, but she is quick to state that they have none, therefore, she can't go back until she is 100%. (Exh. 11)

17. On July 30, 1998, Vincent Alvaro, PA, indicated in a report that:

> The patient wants me to give her off work status or full duty at this time. I told her that I could neither. I told her she is not ready for full duty. Both myself and the physical therapist agree on that. Putting her off work, I told her, would be committing Worker's Comp fraud, because my assessment is that she can go back to

>modified work, sedentary. Just because her employer will not take her at less than 100% physical ability, it cannot change my plan. (Exh. 12)

18.    On October 30, 1998, the plaintiff stated to Dawn Gertson, M.D., from Johnson Occupational and Medical Center, that "she is demanding to know why she is not fully recovered. At this point she is stating that she does not want to return to work." Dr. Gertson scheduled plaintiff for a Functional Capacity Evaluation. (Exh. 13)

19.    On November 23 and 24, 1998, Plaintiff participated in a Functional Capacity Evaluation (FCE). (Exh. 14)

20.    On November 26, 1998, Plaintiff "presents today complaining of increased pain to her neck area and increased pain to 'every muscle in my body.' She recently had an FCE done this past Monday and Tuesday, which she attributes her pain to." (Exh. 15)

21.    The Department of Correction has repeatedly taken the position that a hazardous duty employee working in a correctional facility will not be accommodated or permitted to return from an injury or medical leave if he/she cannot perform the essential functions of his/her job or if he/she has physical limitations, i.e., limitations that prevent a 100% return to work without restriction. This policy was clarified by Maria Houser, Correctional Personnel Director in a letter of December 4, 1998 to Mr. Ken Parker, CEO of UCONN Medical Center. (Exh. 16.) <u>See</u> <u>Motta v. Meachum</u>, 969 F.Supp 99 (D.Conn, 1997). (Exh. 17) (Connecticut DOC did not have to accommodate hazardous duty employee under Rehabilitation Act of 1973 who was unable to work without physical limitations.)

22.    On January 21, 1999, plaintiff cancelled an appointment with Dr. Gertson and stated: "She could not take Dr. Gertson anymore (attitude) . . . Pauline also stated that Dr. Gertson has probably had enough of her as well." (Exh. 18)

23. Between January and November 1999, plaintiff treated with Jay A. Kimmel, M.D., for knee problems; Plaintiff claimed knee pain from the date of her FCE and, contrary to the conservative approach of her physician, plaintiff decided she wanted to have surgery. (Exh. 19)

24. Physical Therapy "Progress Notes" dated 5/15/99 indicates "REHAB POTENTIAL: Fair/poor, pt. states she will be having surgery in three (3) weeks." (Exh. 20)

25. On November 23, 1999, Dr. Kimmel indicated that "what [plaintiff] really wants is for me to write that her injury is the result of her functional capacity evaluation. I am not certain that I can do this." (Exh. 21)

26. On November 23, 1999, Dr. Kimmel wrote to plaintiff and stated "I have given this a lot of thought and feel at this point, that I will not be able to serve as your physician. I feel that I will not be able to help to relieve your pain as I believe that you are too fixated on the effect of the functional capacity evaluation . . . ." (Exh. 22)

27. On March 17, 1999, plaintiff submitted an "Application for Long Term Disability Income Benefits" from the Hartford Life and Accident Insurance Company; medical forms for that application were completed by Dr. Gertson on May 4, 1999. (Exh. 22A)

28. On May 11, 1999, Dr. Kompinger (Orthopedic Associates of Hartford, P.C.) evaluated plaintiff and determined "At this point I believe there is very little to do from a treatment standpoint. I told the patient, that I think frankly she needs to get back to the mainstream of her life." (Exh. 23)

29. Plaintiff was highly critical of Kompinger's report and sent to the doctor a corrected version of his report in her own handwriting. Among other comments, she stated: "Who said I had not gotten into the mainstream of my life. If you recall, I firmly stated to you I

5

wanted to return to my position as a nurse at Osborn C.I. in Somers – but due to my R knee injury ACL-tear, I was unable to until it healed and surgery was being planned." (Exh. 24)

30. On May 19, 1999, Dr. Kompinger issued an "Addendum to 5/11/99 Report" and wrote to plaintiff, inter alia, "This letter is to inform you that I will no longer be able to serve as your physician . . . . I find it necessary that I withdraw from further professional attendance of you, as it has become impossible to maintain an adequate doctor-patient relationship under the present circumstances." (Exh. 25)

31. On June 2, 1999, plaintiff responded to Kompinger's letter with a request for her medical records with the proviso that "I am in great need of medical care . . . ." (Exh. 26)

32. Plaintiff wrote to Brian Eaton at UCHC Human Resources and indicated: "Now, I need yet another physician." (Exh. 27)

33. Plaintiff next obtained Workers' Compensation Commissioner approval to treat with Dr. Steven Selden, a board certified orthopedic surgeon, who evaluated plaintiff on June 22, 1999. (Exh. 28)

34. Dr. Selden's report indicated:

> Pauline Greene sustained a strain to her neck and back as well as a contusion to the area of the coccyx as a result of a work injury in July, 1998. I see no evidence of any permanent impairment as a result of that injury. I am at a loss to explain why she has been out of work for more than eight (8) months. It is my opinion that she is capable of working without any restrictions as a result of the July 1998 injury. The patient does not require any further treatment for the July 1998 injury.
>
> I have nothing to add to her care. The patient does not require any further medical attention to her July 1998 injury. (Exh. 28)

35. In his "Connecticomp Worker Status Report," Dr. Selden indicated that Ms. Greene could return to work on June 23, 1999 "with no limitations." (Exh. 28)

36. As a result of Dr. Selden's report, a "Form 36" was submitted giving notice to plaintiff that the employer intended to discontinue or reduce payments of compensation to plaintiff as "Claimant Release to full regular duty, no restrictions again by treater." (Exh. 29)

37. In response to the Form 36, plaintiff's attorney, Michael J. Rose, wrote to Brian Eaton at UCHC and indicated that he filed an objection to the Form 36 and claimed that UCHC has "failed to return Ms. Greene to her former position of employment." (Exh. 30)

38. On August 3, 1999, Assistant Attorney General Jane Comerford representing UCHC wrote to Attorney Michael Rose, with copy to John Rose, Jr., and stated: "We would be very happy to return her to her former position of employment. However, Ms. Greene has informed us that she does not wish to return to this position or to any other correctional facility. Therefore, please let me know in writing whether Ms. Greene would like us to conduct a search for another position at the UCONN Health Center, or request that DAS perform a search for a position." (Exh. 31)

39. AAG Comerford did not receive a response to that letter from plaintiff, Attorney Michael Rose or Attorney John Rose, Jr.

40. At the request of the Workers' Compensation Commissioner Angelo Dos Santos, plaintiff was evaluated on November 5, 1999 by yet another board certified orthopedic surgeon, Dr. Frank Gerratana. (Exh. 32)

41. Dr. Gerratana found that plaintiff "is employable with the restriction that she not perform activities that involve more than mild amounts of standing and walking." (Exh. 32)

42. At no time since Dr. Selden's report has any doctor determined that plaintiff could work without restriction. (Exh. 9 p. 104, Exh. 33)

43. On August 18, 2000, in response to Workers' Compensation Commissioner Frankel discontinuing plaintiff's benefits, Attorney John Rose, Jr. in plaintiff's Appeal Petition, made the representation that "She is currently totally incapacitated and cannot return to work even for light duty. She works as an LPN in a prison setting . . . claimant continues to be entitled to benefits." (Exh. 34 ¶¶ 10, 12)

44. On July 25, 2001, plaintiff filed a workplace grievance, alleging: "employee released by doctor to return to work employer has not responded." She requested, "return employee to work make whole in every way." (Exh. 35)

45. Plaintiff's grievance was denied at both Step 1 and Step 2 for the reasons that her medical restrictions cannot be accepted by DOC or UCHC, she "refuses to provide any details" of individuals treated differently, and "the evidence does not support a disparate treatment claim." (Exh. 36)

46. On August 31, 2001, plaintiff filed a discrimination complaint with the CHRO against the DOC and UCHC. (Exh. 37) Ms. Green indicated on the cover sheet that the discrimination took place "5-3-99 – present" and checked the box "continuing action." (Exh. 37)

47. After numerous hearings before the Workers' Compensation Commission, on May 3, 2002, Commissioner Ernie Walker found, inter alia, that plaintiff's testimony was not credible or persuasive, that plaintiff had a work capacity following her July 1998 accident, that she had not been eligible for benefits from July 13, 1999 through November 28, 2001 and that the plaintiff must repay the State some $85,000.00 for overpayments that she was not entitled to. (Exh. 38)

48. Commissioner Walker also held that plaintiff's treatment with "Drs. McAllister, Dr. Parikh, Dr. Kimmel, Dr. Fisher, Dr. Patel, and Dr. Piotrowska, Dr. Gibson were not authorized physicians in this matter and conclude that the State is not liable for the same; nor, any prescriptions, diagnostics, physical therapy, aquatics or any treatment modalities that flowed therefrom." (Exh. 38)

49. Commissioner Walker's decision was never appealed.

50. Plaintiff received her last workers' compensation payment in May 2002. (Exh. 9, p. 186)

51. At all times between July 1998 and May 2002 when Commissioner Walker entered his finding, plaintiff and her attorney claimed that she was entitled to the workers' compensation benefits that she received prior to May 2002. (Exh. 9, pp. 62, 186, 202-03)

52. On June 21, 2002, as a result of Commissioner Walker's ruling, UCHC sent a letter to plaintiff informing her that her workers' compensation absence ended July 12, 1999, that her medical leave and FMLA ended on July 11, 2000 and that it was necessary to provide a medical certificate to return to work or plaintiff may be separated from State service. (Exh. 39)

53. Plaintiff responded on June 26, 2002 with a copy of Dr. Selden's June 22, 1999 worker status report and requested reinstatement. (Exh. 40)

54. Plaintiff on June 28, 2002 requested an extension to have a medical certificate sent, which request was granted on July 2, 2002. (Exh. 41)

55. On July 8, 2002, plaintiff provided to UCHC Human Resources Associate Jessica Billerman medical documentation prepared by Charles Brown on July 8, 2002, documenting numerous physical restrictions. (Exh. 42)

56. On account of the physical restrictions and because she exhausted medical and FMLA leaves, plaintiff was separated from State service on July 22, 2002. (Exh. 43)

57. Plaintiff met with Brian Eaton on July 12, 2002 to discuss options for disability retirement. (Exh. 44)

58. On July 16, 2002, plaintiff filed a grievance on account of her termination. Her grievance was denied at Step 2 for the reason that she "was appropriately separated because she had exhausted all of her contractual and statutory leave entitlements." (Exh. 45)

59. On July 25, 2002, plaintiff applied for a "service-connected" disability retirement benefit to be effective August 1, 2002. In support of the application was a medical report signed by Dr. Parikh on July 17, 2002 and listing fourteen current medications. (Exh. 46)

60. Plaintiff acknowledged that in order to get a disability retirement, she had to make the claim that she was totally disabled. (Exh. 9, p. 184)

61 On July 24, 2003, the State of Connecticut Medical Examining board denied plaintiff's application for a service-connected disability. (Exh. 47)

62. When Plaintiff changed her retirement application to a non-service connected application, her application was granted by the Medical Examining Board effective August 1, 2002. (Exh. 48)

63. Plaintiff has received Social Security Disability payments since March 1994. (Exh. 49)

64. In a Work Activity Report sent to the Social Security Administration on April 14, 2000, plaintiff noted the work ended on 07/19/98 due to "disability." (Exh. 50)

65. Plaintiff received $11,871.60 in Social Security Disability benefits in 1998. (Exh. 9, p. 123)

66. Plaintiff received $12,986.00 in Social Security Disability benefits in 1999. (Exh. 9, p. 123)

67. Plaintiff received $28,699.50 in Social Security Disability benefits in 2000, $9796.50 of which should have been received in 1999. (Exh. 9, p. 123)

68. In 2002 plaintiff received $15,620. in Social Security Disability benefits. (Exh. 9, pp. 124-25)

69. In 2003, plaintiff received $14,412. in Social Security Disability benefits. (Exh. 9, pp. 124-25)

70. In order to receive Social Security Disability benefits, plaintiff acknowledges that she must represent that she is disabled. She has never notified Social Security that she was able to return to work. (Exh. 9, pp. 187-89)

71. Plaintiff has had to use a cane continually from July 1998 to the present time. (Exh. 9, p. 150)

72. At all times prior to May 2002, plaintiff was receiving workers' compensation benefits at 100% of her salary. (Exh. 9, p. 166)

73. Plaintiff indicated that she has not sought work since July 1998 because she has "been too medically distraught." (Exh. 9, p. 182)

74. In an October 29, 2003 ruling, Workers' Compensation Commissioner Miles took evidence regarding plaintiff's financial circumstances to pay her compensation overpayments and heard evidence as to earlier testimony of additional overpayments from November 29, 2001 to May 3, 2002. Commissioner Miles found the plaintiff's total overpayment liabilities to be $93,790.68. (Exh. 51)

75. Plaintiff's appeal of Commissioner Miles' ruling was dismissed on September 28, 2004. (Exh. 51)

76. Jessica Van Alstyne, Personnel Specialist I in the Human Resource Department at UCHC reviewed personnel, medical and worker's compensation files of individuals similarly situated to plaintiff. (Exh.. 53)

77. After reviewing all pertinent documents, Ms. Van Alstyne prepared a list of all UCHC employees who were on *medical leave* between 1996 and 2003, who were released to work light duty, but who were not allowed to return to work until they were released to full duty without restrictions. All of these individuals eventually returned to work without restriction. (Exhs. 52A, 53)

78. Exhibit 52A reveals eight (8) white females, three (3) white males, two (2) Hispanic females, one (1) Hispanic male and one (1) black female.

79. After reviewing all pertinent documents Ms. Van Alstyne prepared a list of all UCHC employees who were on *worker's compensation* between July 1998 and 2003 who were released to work light duty, but who were not allowed to return to work until they were released to work full duty without restrictions. Of these 103 individuals, 87 eventually returned to work without restrictions. Fifteen individuals were separated from State service as noted. (Exhs. 52B, 53)

80. Exhibit 52B reveals of the fifteen individuals who were separated from State service, two (2) white males, one (1) Hispanic female, seven (7) white females and five (5) black females.

81. After reviewing all pertinent documents, Ms. Van Alstyne prepared the attached list of all UCHC employees who went out on *worker's compensation* between 1998 and 2003

12

and who did not return to work. Some took disability retirement, some did regular retirement, and some resigned. (Exhs. 52C, 53)

82. Exhibit 52C reveals twelve (12) white females, four (4) white males, and seven (7) black females.

83. After reviewing all pertinent documents, Ms. Van Alstyne prepared the attached list of all UCHC employees who went out on *medical leave* between 1998 and 2003 and who did not return to work. Some took disability retirement, some did regular retirement, some resigned and some were layed off. (Exhs. 52D, 53)

84. Of the six (6) individuals in Exh. 52D whose "position" was "held one (1) year," all exhausted their medical leaves and were subsequently separated from State service. Of those six (6) individuals who included the plaintiff, four (4) were white females and two (2) were black females.

85. Ms. Van Alstyne reviewed all personnel, worker's compensation and medical files pertaining to a list requested in February 2002 as part of "Pauline Greene's Grievance." (Exhs. 53, 55)

86. After reviewing all pertinent documents, Ms. Van Alstyne prepared Exhibit 54 that contains return to work information for each name sought. In short, the documents revealed that men and women, White and Black, were held to the same standards regarding returning to work without physical restrictions. (Exh. 53, 54)

                DEFENDANTS,
                UNIVERSITY OF CONNECTICUT
                HEALTH CENTER, CONNECTICUT
                DEPARTMENT OF CORRECTION

BY:    RICHARD BLUMENTHAL
        ATTORNEY GENERAL

        _____
        Jane B. Emons
        Assistant Attorney General
        Federal Bar No. ct16515
        55 Elm Street - P.O. Box 120
        Hartford, CT  06141-0120
        Tel: (860) 808-5340
        Fax: (860) 808-5383
        Email:  Jane.Emons@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing Defendant's Rule 56(a)1 Statement of Undisputed Facts was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 12th day of November, 2004, first class postage prepaid to:

John R. Williams, Esq.
Williams and Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT  06510

        _____
        Jane B. Emons
        Assistant Attorney General