UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PAULINE G. GREENE | : | |
| | : | |
| VS. | : | NO. 3:03CV526(WWE) |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | |
| HEALTH CARE CENTER, | : | |
| CONNECTICUT DEPARTMENT | : | |
| OF CORRECTIONS | : | AUGUST 11, 2005 |

## BRIEF IN OPPOSITION TO MOTION FOR ATTORNEY FEES

"The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, was designed to allow private individuals a meaningful opportunity to vindicate civil rights violations.  As stated in the legislative record, '[i]f private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.' S.Rep.No. 1011, 94th Cong., 2d Sess. 2 (1976)...." Ortiz v. Regan, 980 F.2d 138, 140 (2nd Cir. 1992).

"An award of attorney fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct....A prevailing defendant should only recover upon a finding by the

district court that the plaintiff's action was frivolous, unreasonable, or without foundation...." Riddle v . Egensperger, 266 F.3d 542, 547 (6th Cir. 2001); Dubuc v. Green Oak Township, 312 F.3d 736, 754-55 (6th Cir. 2002); Tahfs v. Proctor, 316 F.3d 584, 596 (6th Cir. 2003).  The court must "resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978).

In Leffler v. Meer, 936 F.2d 981 (7th Cir. 1991), the court held that defendants have a duty to mitigate damages by moving for summary judgment at the earliest possible opportunity and cannot seek attorney fee awards for time expended after the point at which they could have successfully terminated the litigation.  In this case, the defendant waited more than a year and a half after appearing in the litigation to seek summary judgment.  Although this court did ultimately grant summary judgment against the plaintiff, the issue was genuinely contested, as the court itself agreed in noting the relatively few factual points on which there was not a genuine evidence-based dispute.  The plaintiff had actual evidence, which she submitted to the court in opposition to the defendant's motion, which as noted in her Local Rule 56 Statement supported the following contentions:

1. From the very beginning of her employment by the defendant's predecessor, the Connecticut Department of Correction, the plaintiff was subjected to a hostile work environment based on her race, including racial slurs and disparate treatment.  (Exhibit B, ¶¶ 2, 3, 4, 5, 6, 7, 8, 11, 12, 17)

2. The plaintiff is physically disabled.  She receives disability retirement compensation.  She has undergone surgery on her left knee and anticipates surgery on her right knee.  She continues to suffer from severe neck, shoulder and back pain.  (Exhibit A, ¶ 6)

3. The plaintiff suffered knee injuries along with back and right Achilles tendon injuries.  She suffered multiple trauma to her body from the 1990 injury at the Somers/Osborne Facility.  (Exhibit A, ¶ 7)

4. The defendant denied the plaintiff reasonable accommodations for her disabilities.  (Exhibit A, ¶ 10)

5. The defendant has treated the plaintiff differently from her white co-workers.  She has been denied the right to work with a disability when her co-workers were given that right.  (Exhibit A, ¶ 16)

6. Although the plaintiff was receiving Workers

Compensation, she was trying to return to her job with the defendant. She attended meetings with the authorized representatives of the defendant, requesting that she be allowed to do so. She was refused permission. (Exhibit A, ¶ 17)

    7. The defendant forced the plaintiff, when she asked to return to work, to undergo a Functional Capacity Examination contrary to the defendant's own regulations and practices. (Ibid.)

    8. No other workers at the plaintiff's facility were required by the defendant to undergo a Functional Capacity Examination when they requested to return to work following an injury. (Ibid.)

    9. At her Functional Capacity Examination, the plaintiff was forced to crawl on her knees despite documentation of a pre-existing knee injury. (Ibid.)

    10. At her Functional Capacity Examination, the plaintiff was forced to climb a ladder despite documentation of a pre-existing knee injury. (Ibid.)

    11. The plaintiff's job with the defendant was working as a nurse at an out-patient clinic. (Ibid.)

    12. Throughout these events, the plaintiff was subjected to overt racial harassment by her supervisor. (Ibid.)

13. None of the white employees of the defendant was required to go to a Functional Capacity Exam before returning to work from Workers Compensation leave. (Id. ¶ 18)

14. White employees of the defendant were allowed to return to work with devices to aid them to work, such as braces, canes, crutches, casts and hearing aids. Some needed the use of dialysis three times weekly. They were not subjected to the "100%" rule to which the plaintiff was subjected. (Ibid.)

15. The plaintiff was the only black nurse on the first shift. She was subjected to racial remarks by a co-worker and, when this was reported to her supervisor, the supervisor refused to take any action. (Id. ¶ 19)

16. The plaintiff's efforts to obtain Workers' Compensation benefits always have been coupled with efforts to be permitted by the defendant to return to work. The plaintiff has consistently maintained that she is able to work for the defendant; but that if the defendant insists on taking the position that she is not, then she is entitled to Workers' Compensation benefits "because the State couldn't have it both ways." (Exhibit C, p. 63)

17. The plaintiff never was aware of any request by the

State of Connecticut, through AAG Comerford or otherwise, for her to return to work. (Exhibit C, pp. 64, 74-75)

18. When Dr. Selden reported that the plaintiff was able to return to work for the defendant without restrictions, the defendant refused to take the plaintiff back, stating that "unless I was 100 percent, I could not return...." (Exhibit C, pp. 64-65)

19. The plaintiff always has wanted to return to work for the defendant and the only reason she has not done so is that the defendant would not allow her to do so. (Exhibit C, p. 68)

20. The plaintiff's efforts to return to work for the defendant were handled personally by the plaintiff. Her attorney represented her in other matters, but not in that matter. If the defendant communicated on the subject of returning to work only with the plaintiff's attorney, as it claims, then it failed to communicate with the plaintiff because Attorney Rose was not representing the plaintiff in that matter and the defendant knew it. (Exhibit C, pp. 75-76)

21. The names on Defense Exhibit 55 are not the only white persons the plaintiff contends were permitted to return to work at less than "100%" after being out of work due to injuries. (Exhibit C,

pp. 76-77)

    22. The plaintiff was fully capable of returning to work for the defendant with an accommodation of her physical problems, but the defendant consistently refused to do so although it did grant such accommodation to white employees similarly situated to her. (Exhibit C, p. 105)

    23. Mary Lou Gibbons, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from epilepsy and therefore could never be alone in the institution. (Exhibit 54)

    24. Michelle Cabana, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working more than eight hours per day, contrary to regulations of the defendant which require all "100%" employees to be able to work additional hours at any time. (Ibid.)

    25. Catherine Wilson-Spain, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working overtime, contrary to regulations of the defendant

7

which require all "100%" employees to be able to work overtime without warning. (Ibid.)

26. Peter Bert Henry, a white male, was permitted to work in a position comparable to the plaintiff's although he suffered from a deformed hand. (Ibid.)

27. Lorraine Szklarz, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working overtime, contrary to regulations of the defendant which require all "100%" employees to be able to work overtime without warning. (Ibid.)

28. Linda Cote, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working on the third shift, despite regulations of the defendant which require all employees to be capable of working around the clock without warning. (Ibid.)

29. Carol Fey, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working more

than eight hours per day, contrary to regulations of the defendant which require all "100%" employees to be able to work additional hours at any time. (Ibid.)

30. Jacqueline Howard, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working a full schedule, contrary to regulations of the defendant which require all "100%" employees to be able to work additional hours at any time. (Ibid.)

31. Donna Flores, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working more than eight hours per day, contrary to regulations of the defendant which require all "100%" employees to be able to work additional hours at any time. (Ibid.)

32. Pamela Fairhurst, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working on weekends, contrary to regulations of the defendant which require all "100%" employees to be able to work weekends.

(Ibid.)

33. Catherine Genova, a white female, was permitted to work in a position comparable to the plaintiff's although she suffered from an unstated physical condition which prevented her from working more than eight hours per day, contrary to regulations of the defendant which require all "100%" employees to be able to work extra hours without notice. (Ibid.)

With such evidence to support her contention that she was the victim of race discrimination, and this court's earlier agreement that the plaintiff did establish a *prima facie* case of discrimination, it is not possible to say as the defendant wishes that this action was frivolous.

The motion for defense attorney fees must be denied.

Respectfully submitted:

_____
JOHN R. WILLIAMS (ct00215)
51 Elm Street, Suite 409
New Haven, CT 06510
203.562.9931
FAX: 203.776.9494
E-Mail: jrw@johnrwilliams.com
Plaintiff's Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Attorney Jane B. Emons, Assistant Attorney General, P.O. Box 120, Hartford, CT 06141-0120.

_____
JOHN R. WILLIAMS